# Exhibit B

RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
LAUREN D. GORMAN
Assistant Federal Public Defender
Nevada State Bar No. 11580
201 W. Liberty Street, Ste. 102
Reno, Nevada 89501
(775) 321-8451/Phone
(775) 784-5369/Fax
Lauren_Gorman@fd.org

Attorney for CARRILLO-LOPEZ

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>GUSTAVO CARRILLO-LOPEZ,<br><br>    Defendant. | Case No. 3:20-CR-00026-MMD-WGC<br><br>**Reply in Support of Motion to Dismiss Because § 1326 Violates Equal Protection Under** *Arlington Heights*[1] |

## I. INTRODUCTION

In its response to Mr. Carrillo-Lopez's motion to dismiss the indictment, the government never genuinely disputes that discrimination was a "motivating factor" in Congress's criminalization of illegal reentry. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Nor does it show that Congress would have passed the Undesirable Aliens Act of 1929 "even had the impermissible purpose not been considered." *Id*. at 270 n.21. Indeed, the government totally ignores the expert opinion of a renowned historian in this field, and barely even acknowledges the voluminous record of racist statements by legislative and executive officials underlying the illegal entry law—just a few of which were

---

[1] This reply is timely filed.

that Congress wished to keep the "rat men" out of the American gene pool;[2] "protect[] [the] American racial stock from further degradation or change through mongrelization"[3]; avoid "poisoning the American citizen";[4] and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."[5] Instead of grappling with, and acknowledging in a fair-minded way, the troubling racist history of § 1326, the government indulges in scholastic meditations about whether calling Mexicans "scoff" and "mongrels" is racist or, instead, just "startling comments" that are truly motivated by the desire to "preserve jobs for American citizens." ECF No. 29 at 27. And it dismisses the careful academic analysis of illegal reentry's racist origins and impact, in dog-whistle terms.

It then swiftly turns away from the merits of Mr. Carrillo-Lopez's brief to claim, instead, that any racial intent motivating the criminalization of illegal reentry is irrelevant and unreviewable. It starts with a claim of irrelevancy – that the considerable evidence demonstrating that Congress's original decision to criminalize illegal reentry is irrelevant because, even if the 1929 Act was improperly motivated, the reenactment of that law in the Immigration and Nationality Act of 1952 removed its racist origins. But the government has not come close to showing that, through the 1952 Act, Congress reckoned with the 1929 Act's discriminatory inception. Nor could it. Rather than grappling with the law's foundation, Congress explicitly decided to "carr[y] forward" and "substantially reenact[]" the 1929 law into the 1952 Act. Under longstanding Supreme Court precedent, such pro forma recodifications do not detach a law from its original intent.

The government next invites the Court to apply a conceptual framework at odds with controlling precedent, asserting that Congress can pass racially animated domestic criminal

---

[2] Hans P. Vought, The Bully Pulpit, 174–75 (2004) (statement of Secretary of Labor James Davis).

[3] ECF No. 26, Exhibit E, Cong. Rec. at 121–22 (statement of Representative Box).

[4] ECF No. 26, Exhibit C (statement of Representative Fitzgerald)

[5] ECF No. Exhibit G, 69 Cong. 69 (statement by constituent with which Representative Box and Commissioner General of Immigration agreed).

2

laws so long as they are rationally related to regulating immigration. Not only does no controlling authority support this striking proposition – which would justify overtly racialized criminal punishment for immigrants within our borders – but the entire history of equal-protection law teaches that, even in areas of apex deference, race discrimination requires exacting judicial scrutiny.

Ultimately, the government is reduced to making the circular argument that because enforcement efforts have continued to overwhelmingly target Mexicans, Latinos, and the southern border, the law's disparate effect is simply a product of geography. But all that *Arlington Heights* requires is that the law continue to "bear more heavily[]" on Mexicans and Latinos. Given the overwhelmingly lopsided statistics, that can hardly be disputed.

While the government may seek to play it down, the disturbing reality is that, in a moment of eugenical zeal, Congress enacted a federal criminal law targeting Latinos and people of Mexican descent. The intended effects of that law have reverberated across generations, tracing a straight line from 1929 to today. For the reasons above and below, the Court should find that § 1326 violates equal protection under *Arlington Heights*, or, at a minimum, hold a hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

## II. ARGUMENT

### A. Pro forma reenactments have not cleansed § 1326 of its racist origins.

The government begins by claiming that the racist motivations for the 1929 law are irrelevant because Congress reenacted that statute as part of the 1952 Act, and thereafter increased the penalties for the offense several times. But over a century of Supreme Court opinions establish that a statute originally passed for one purpose does not take on another purpose through pro forma reenactments. And that is precisely what Congress did in 1952: voicing its desire to have the 1929 aw "carried over," it re-codified it without acknowledging its racist foundations. The same is true for Congress's subsequent ratcheting-up of the penalties

3

of the crime, which have served – in line with the intent of the 1929 drafters – to send Latinos to prisons in astoundingly lopsided rates.

In his motion to dismiss, Mr. Carrillo-Lopez noted that, just last term, two Supreme Court decisions held that reenacting a law passed with discriminatory purpose does not cleanse the law of that purpose. First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that in "assess[ing] the functional benefits" of a law, courts cannot "ignore the very functions those rules were" – at inception – "adopted to serve." 140 S. Ct. 1390, 1401 & n.44 (2020). Then, in *Espinoza v. Montana Dep't of Revenue*, the majority relied on a law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). Concurring, Justice Alito noted that "because I lost, and *Ramos* is now precedent," the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted).

In arguing that the legislative intent underlying the 1929 Act is irrelevant to its pro forma reenactment in the 1950s, the government simply ignores the teaching of *Ramos* and *Espinoza*, instead citing cases supporting the proposition that, in some circumstances, later reenactments may cleanse a law of its original taint. But the statements in *Ramos* and *Espinoza* must not be ignored. First, they limn an approach that is, in the words of Justice Alito, "now precedent." *Espinoza*, 140 S. Ct. at 2259. Second, even if the Court were inclined to view these comments as dicta, "lower courts are advised to follow the Supreme Court's considered dicta." *Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072, 1079 & n.5 (9th Cir. 2020). In fact, courts must accord it "great weight." *Coeur d'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004). Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268. On the scale of prophetic dicta, this endorsement during the Court's most recent term rates exceptionally high.

4

Nor can *Ramos* and *Espinoza* be distinguished and confined in the ad hoc way the government (in a different section of its response brief) offers up. The government says *Ramos*'s analysis is confined to the Sixth Amendment context – and that alienage laws warrant different treatment – but it gives no principled reason to think that this is true. Moreover, illegal reentry isn't an alienage law; it is a domestic criminal statute, exactly like the statute at issue in *Ramos*. The government's attempt to distinguish Ramos accordingly fails. Its attempt to explain away *Espinoza* fails even harder. *Espinoza* stands – precisely – for the proposition that a law's "checkered history" of discriminatory religious intent will not be cleansed by reenactment. The government tries to say that *Espinoza* considered the original history of a reenacted law not because that history matters in assessing continuing discriminatory motive, but because the majority was responding "to a dissenting argument that accused the majority of considering a 'historic and substantive tradition' that the dissenter believed was 'incomplete at best.'". ECF No. 29 at 24 n.2. But that's just not what *Espinoza* was up to. It examined history to determine whether a reenacted statute was still infected with its predecessor's discriminatory intent. That is exactly what Mr. Carrillo-Lopez asks the Court to do here.

And it's not as if this general principle is of recent vintage. In fact, its provenance stretches back over 100 years. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1 (1896), for example, the Supreme Court explained that a statutory repeal and recodification has no impact on the intended effect of the substantive provisions that remain the same:

> Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the act of 1888 when these similar provisions have not been in force. Notwithstanding, therefore, this formal repeal, it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act.

5

164 U.S. at 11-12 (citing *Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985), the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act, id. at 246 & n.18. The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29.

Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and consequences, and decided it was nonetheless good policy, the government would have a point. But the government offers no principled reason why any amendment or reenactment – no matter how insubstantial – would neutralize a law's racist foundations. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (refusing to import discriminatory intent of prior legislature, but only because it did "not confront a situation like the one in *Hunter*. Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature . . . . Nor did [the Texas legislature] use criteria that arguably carried forward the effects of any discriminatory intent on the part of the [earlier Legislature]."). In fact, requiring legislative bodies to reevaluate laws previously passed with prohibited intent serves the critical purpose of preventing the unlawful vestiges of the past from moving silently into the present merely through inertia and the passage of time. *See United States v. Fordice*, 505 U.S. 717, 728 (1992) ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation").

6

Here, the government has not shown that Congress meaningfully reevaluated the illegal reentry statute when enacting the 1952 Act. Nor could it. Although, as the government notes, the 1952 Act was designed to reorganize the nation's immigration laws, Congress explicitly decided that "the present Act of March 4, 1929 should be reenacted" within the new INA. S. Rep. No. 81-1515, at 655 (1950), r*eprinted in Trelles, Oscar & James F. Bailey, Immigration and Nationality Acts: Legislative Histories and Related Documents* 1950-1978; attached as Snyder Decl., Ex. O. Explicitly recodifying the same offense, on the same terms, with substantially the same language is a no way to mark a change. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997). It does point out that in 1965 Congress took steps to address a different racist aspect of the immigration laws – the national origins quota system – but nothing in the historical record in any way suggests that it has similarly reckoned with the racism inherent in § 1326.

The government does not even allege that any of the subsequent reenactments of § 1326 involved any real reconsideration of the law. These reenactments largely only stiffened its penalties. Those changes, which sent more and more Latinos to federal prison for longer sentences, certainly did nothing to undermine the law's original foundations.

**B.  The Court should assess Mr. Carrillo-Lopez's equal-protection challenge under the A*rlington Heights* framework and apply strict scrutiny.**

Jettisoning traditional equal-protection analysis – which starts by focusing on the classification – the government argues that the *Arlington Heights* framework has no place in evaluating Mr. Carrillo-Lopez's race- and ethnicity-based equal-protection challenge. Instead, it contends that the federal government's sovereign authority to regulate entry and exclusion requires the Court to evaluate the law – as distinct from the classification drawn by the law – under a rational-basis review. The unstated principle appears to be that, no matter how odious, flagrant, or despicable a law or government action may be, courts must give it hands off deference whenever it is rationally related in some way to regulating immigration.

7

If this argument sounds familiar, that is because the Ninth Circuit has twice considered and rejected it in recent years. First, in *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, the government claimed that a race-based equal-protection challenge its DACA-termination decision was either not cognizable or subject to a modified, deferential equal-protection review. 908 F.3d 476, 518-20 (9th Cir. 2018). The Ninth Circuit disagreed with that argument, instead applying *Arlington Heights* to find that the Latino plaintiffs had stated a viable equal protection claim. *Id*.

This summer, at least five members of the Supreme Court agreed that *Arlington Heights* applied, but ultimately rejected the plaintiffs' claim on its facts. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1915- 16 (2020); id. at 1917-18 (Sotomayor, J.).

Following the Supreme Court's opinion in *Regents*, the Ninth Circuit last month reaffirmed the proper framework, rejecting the government's contention – based on the same principal cases cited in the opposition[6] – that an equal-protection challenge to its TPS termination decision was subject to something other than traditional *Arlington Heights* analysis. *Ramos v. Wolf*, No. 18-16981, 2020 WL 5509753, at *17 (9th Cir. Sept. 14, 2020). Although *Ramos* didn't involve criminal penalties, and even though TPS decisions touch directly on the government's sovereign authority to regulate entry and exclusion, the Ninth Circuit applied *Arlington Heights* because the challenged decision applied to people already within the country, didn't have an overwhelming national-security justification, and asserted a race- and ethnicity-based equal-protection challenge. *Id*. at *17 (*citing Regents*, 140 S.Ct. at 1915; *Regents*, 908 F.3d at 519-20; *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law . . . . [O]nce an alien enters the country, the legal circumstance changes, for

---

[6] See AOB in *Ramos v. Nielsen*, 2018 WL 6420267 (CA 9), 49-54 (citing, among others, *Trump v. Hawaii*, 138 S.Ct. 2392 (2018); *Fiallo v. Bell*, 430 U.S. 787 (1977); *Mathews v. Diaz*, 426 U.S. 67 (1976); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)).

8

the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.")).

Consistent with the reasoning of *Regents* and *Ramos*, multiple district courts have applied *Arlington Heights* to race-based immigration challenges brought by in-country plaintiffs. *See California v. U.S. Dep't of Homeland Sec.*, No. 19-CV-04975-PJH, Case 1:20-cr-00145-BLW ___F.Supp.3d___, 2020 WL 4440668, at *15-19 (N.D. Cal. Aug. 3, 2020); *Cook Cty., Illinois v. Wolf*, No. 19 C 6334, ___F.Supp.3d___, 2020 WL 2542155, at *7 (N.D. Ill. May 19, 2020); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 325 (D. Md. 2018); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F.Supp.3d 393,412 (D. Mass. 2018). As one court in this Circuit put it before *Ramos*, which only reinforced the point, the clear teaching of *Regents* is "that application of the Arlington Heights framework is appropriate" to evaluate race and ethnicity challenges where the challenger is inside the country. *California*, at *19.

Logically, if that is true in civil actions involving decisions about who can live and work in the United States, it can be no less true where an in-country defendant claims that the government is seeking to punish him under a racially motivated criminal law. Indeed, over a century ago in *Wong Wing* v. United States, 163 U.S. 228, 237 (1896), the Supreme Court drew an express distinction between civil entry bars and removal orders, on the one hand, and criminal prosecutions, on the other, holding that greater protections necessarily apply when the government seeks to "punish[] by deprivation of liberty and property." In the decades since, courts have continued to apply that rule, recognizing that the threat of criminal sanction necessarily warrants increased judicial scrutiny. *Zadvydas*, 533 U.S. at 690 (recognizing that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections"); *Alvarez-Mendez v. Stock*, 941 F.2d 956, 962 & n.6 (9th Cir. 1991) ("[The Fifth and Sixth] amendments apply to aliens as well as to citizens").

Thus, even if the government's deference argument has purchase in some settings, where domestic criminal penalties begin, hands-off judicial review of immigration laws necessarily ends. Were the rule otherwise, the government would be empowered to impose racially disparate criminal penalties on immigrants within our borders. Because that cannot possibly be, as in *Regents* and *Ramos*, the traditional equal-protection framework embodied by *Arlington Heights* applies.

The government cites three cases to support its argument that § 1326's criminal character has no bearing on the equal-protection analysis. The first, *United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), establishes only that, despite lacking any support in Constitutional text, Congress had the power to enact § 1326. The other two, far from helping the government, directly support Mr. Carrillo-Lopez's position. In both *United States v. Lopez-Flores*, 63 F.3d 1468 (9th Cir. 1995), and *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit evaluated the defendants' arguments under a traditional equal-protection framework. While the claims were rejected on their facts, was because the challenged classification – alienage – qualified for only rational-basis review.

This case involves race and ethnicity discrimination, which, unlike alienage, merits strict scrutiny. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Because racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification, our review of whether such requirements have been met must entail a most searching examination").

This is true notwithstanding the government's suggestion, citing *United States v. O'Brien*, 391 U.S. 367 (1968), that the legislative "motive-probing" envisioned by *Arlington Heights* is somehow improper ECF No. 29 at 6. If true, that would be news to the Supreme Court and Ninth Circuit, which have applied *Arlington Heights* – issued nine years after *O'Brien* – repeatedly to laws passed by legislative bodies. *E.g., Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (striking down portion of Alabama's constitution based on legislators' racial

10

1 animus); *Arce v. Douglas*, 793 F.3d 968, 981 (9th Cir. 2015) (applying *Arlington Heights* to
2 law eliminating cultural studies program).

3 To say that *Arlington Heights* applies is to say nothing more than that conventional
4 equal-protection rules obtain, and that there is no immigration exception allowing Congress to
5 pass racially discriminatory domestic criminal laws. *See Kwai Fun Wong v. United States*, 373
6 F.3d 952, 974 (9th Cir. 2004) ("We cannot countenance that the Constitution would permit
7 immigration officials to engage in such behavior as rounding up all immigration parolees of a
8 particular race solely because of a consideration such as skin color").

9 Indeed, *Arlington Heights* fits squarely within the traditional three-question framework
10 for evaluating any equal-protection challenge: (1) what is the classification, (2) what level of
11 scrutiny applies to the classification, and (3) does the challenged government action withstand
12 the level of scrutiny? Chemerinsky, Constitutional Law 670-73 (3d ed. 2006).

13 For question one, *Arlington Heights* analysis recognizes that sometimes discriminatory
14 animus exists, but isn't present on the face of the challenged law. In that posture, *Arlington
15 Heights* offers another way of showing that, in fact, a law classifies at least partly along
16 prohibited lines. 429 U.S. at 266-68. Once that showing is made, whether under *Arlington
17 Heights* or otherwise, racial or ethnic discrimination always subjects a law to strict scrutiny,
18 even for a facially neutral law that makes no mention of race. *Washington v. Davis*, 426 U.S.
19 229, 241-42 (1976). While the government seeks to recast Mr. Carrillo-Lopez's challenge as
20 one based on alienage, the moving papers make abundantly clear that his challenge is not
21 grounded in distinctions between citizens and non-citizens, or between immigrants and
22 nonimmigrants. It is focused squarely on animus toward Latinos and people of Mexican
23 heritage. Mr. Carillo-Lopez knows of no modern case – including in areas of maximal
24 government deference – where race and ethnicity classifications have received anything but the
25 most exacting scrutiny. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944), over'd on
26 other grounds by *Hawaii*, 138 S.Ct. at 2423 (in wartime national-security context, where
governmental power is at its peak, courts must apply "the most rigid scrutiny" to racial

11

classifications); *Johnson v. California*, 543 U.S. 499, 512 (2005) (in prison setting, where administrators receive extreme deference and fundamental rights are dramatically curtailed, *Turner v. Safley*, 482 U.S. 78, 89 (1987), courts must nonetheless subject racial classifications to strict scrutiny).

In this case, surviving that scrutiny requires showing that the illegal-reentry provision in the 1929 Act would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 265-66 & n.21. While the government seeks to avoid that standard, it does so not because applying it would be incorrect as a matter of law, but because the challenged law can't possibly meet it.

**C. Section 1326 continues to "bear[] more heavily" on Mexicans and Latinos, which is all that *Arlington Heights* requires to show disparate impact.**

The government does not contest Mr. Carrillo-Lopez's evidence showing that Mexican and Latino defendants have made up the overwhelming majority of people charged and convicted under § 1326. Instead, it claims that the disparate impact is "a product of geography, not discrimination" ECF No. 29 at 13. But this argument conflates the law's reasons with it results. The government cannot dispute that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. That is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233. In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites." *Id*. at 227. The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id*. That was all that was necessary to show disparate impact. *See id.* at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

1    Here, Mr. Carrillo-Lopez easily clears this threshold. As the moving papers show, in the
2    years following the 1929 law's passage, Mexicans comprised a huge proportion of those
3    prosecuted and convicted under modern-day § 1326. Today, Mexicans and Latinos continue to
4    make up 99% of all people prosecuted under the law. Under *Arlington Heights* and *Hunter*, it
5    is irrelevant whether § 1326's present disparate impact is a product of "geography" or
6    "discrimination." All that matters is that it does overwhelmingly impact Mexican and Latino
7    communities today. On this point, the government's characterization of the Supreme Court's
8    Regents opinion demonstrates its confusion. See ECF No. 29 at 13. In *Regents*, the plurality
9    held that disparate impact was not alone enough to make up an entire *Arlington Heights* claim,
10   as there was "nothing irregular about the history leading up" to DACA's rescission, and public
11   officials' statements there were "unilluminating" on the question of discriminatory purpose.
12   140 S. Ct. at 1915-16. That simply reiterated the holding of *Arlington Heights* that "official
13   action will not be held unconstitutional solely because it results in a racially disproportionate
14   impact." 429 U.S. at 264-65 (*citing Davis*, 426 U.S. 229). It did not undermine the basic premise
15   of *Hunter*: that disparate impact is evaluated by whether a law continues to have the racist effect
16   its original enactors intended – not whether its current disparate impact is motivated by a current
17   desire to discriminate. *See Hunter*, 471 U.S. at 233. Of course, if that were the standard, the
18   government's "geography" argument is more than a little circular given that the United States
19   has many borders and immigrants from many countries, yet has consistently focused its
20   enforcement efforts in just one direction. See, e.g., U.S. Dep't of Justice, Statements of AG
21   Sessions (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-
22   tolerance-policycriminalillegal-entry ("[T]he Department of Homeland Security is now
23   referring 100 percent of **illegal Southwest Border** crossings to the Department of Justice for
24   prosecution. And the Department of Justice will take up those cases.") (emphasis added).
25   Plus, almost every claim of disparate impact under *Arlington Heights* could be
26   characterized as a "product of geography." For instance, the Ninth Circuit has held that planning
     decisions made with a racist purpose in predominantly- or trending-Latino neighborhoods have

13

disparate impacts on Latino people, *The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704-06 (9th Cir. 2009); that educational decisions made with a racist purpose in a predominantly Latino city have a disparate impact on Latino students, *Arce*, 793 F.3d at 978; and that voting decisions made with a racist purpose in a state where some American Indian, Latino, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities, *D.N.C. v. Hobbs*, 948 F.3d 989, 1004-06 (9th Cir. 2020) (en banc). If the government's "geography" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

### D. As confirmed by voluminous documentary evidence and the proffered testimony of experts, Congress passed the illegal-reentry law with invidious intent.

In paragraphs wisely buried in the middle of its brief, the government makes an ill-advised and tepid attempt to defend the legislative motives underpinning the 1929 Act (OB at 15). Its arguments on this score are cramped and counterfactual, failing to explain why, among other things, the report and proffered testimony of subject-matter experts, which are entirely consistent with capacious documentation, are less accurate that a non-expert government lawyer's interpretation of the historical record.

The government suggests that the 1929 Act was free from animus because the Immigration Act of 1924 didn't subject Mexicans to entry quotas. But the voluminous evidence presented in support of Mr. Carrillo-Lopez's motion shows that the only thing keeping Congress from setting a quota on Mexicans throughout the 1920s was pressure from agricultural growers, not a lack of racism. In other words, the absence of quotas in 1924 was in spite of the legislators' discriminatory intent, not because it was lacking. Indeed, as thoroughly documented in the moving papers, the crime of illegal entry was brokered as a compromise between agricultural growers and nativists in Congress, allowing Congress's racial goals to be fulfilled while avoiding economic harm to growers.

14

The government also suggests that Mr. Carrillo-Lopez's selected unrepresentative quotations, thereby failing to capture a nuanced process in which lawmakers were motivated by "cheap Mexican labor" that was "taking away jobs from American citizens"– or that they chose to target Mexicans by criminalizing illegal reentry not out of racial animus, but to prevent "hordes that come across the bridges with no intention of ever going back, coming across to get jobs of Americans." ECF No. 29 at 29.

But Mr. Carrillo-Lopez's burden is not to show that the 1929 Act was solely animus-driven. Instead, it is to show that invidious discrimination was a "motivating factor":

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Arlington Heights*, 429 U.S. at 265-66. In any case, the legislators that Mr. Carrillo-Lopez identified and quoted in his motion were not random congress members. They were the drafters of the legislation and the heads of the immigration committee. Thus, while the government is undoubtedly correct that lawmaking often involves competing and multifaceted concerns, it is hard to imagine a more developed record of racial and ethnic animus leading right up to the moment of a law's enactment.

The historical reality is that, at a time of eugenical and nativist enthusiasm, key legislators and government actors expressed an overwhelming and unabashed interest in keeping the "rat men" out of the gene pool, protecting the "American racial stock from . . . mongrelization," and keeping out "the scoff and scum, the mongrel . . . from Mexico." Over a number of years, that racial animus permeated a legislative process that culminated in the law

15

under dispute. While it may be true that various legislators also had economic concerns, those concerns do not alter the historical fact that racism was at least a "motivating factor," which is all that the law requires. *Hunter*, 471 U.S. at 232.

At a minimum, if the government truly wants to contest § 1326's discriminatory purpose, the way to do that should be through an evidentiary hearing, with actual experts on the topic, not the tangential arguments of government counsel.

### III.  CONCLUSION

For the reasons stated above and in Mr. Carrillo Lopez's motion to dismiss, the Court should dismiss the indictment. Alternatively, it should hold an evidentiary hearing to determine whether, as the government now claims, Congress would have passed the illegal reentry provisions of the 1929 Act without any racist motive or intent.

DATED November 6, 2020.

                                        RENE L. VALLADARES
                                        Federal Public Defender

By:  */s/ Lauren Gorman*
       LAUREN GORMAN
       Assistant Federal Public Defender
       Counsel for CARRILLO-LOPEZ

# **CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on November 6, 2020, she served an electronic copy of the above and foregoing **Reply in Support of Motion to Dismiss Because § 1326 Violates Equal Protection Under** *Arlington Heights* by electronic service (ECF) to the person named below:

> NICHOLAS A. TRUTANICH
> United States Attorney
> PETER WALKINGSHAW
> Assistant United States Attorney
> 400 South Virginia Street, Suite 900
> Reno, NV 89501

>  */s/ Katrina Burden*
> Employee of the Federal Public Defender